**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| JACQUERI LAIRD, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   vs. | ) | Case No.:  1:23-cv-00119 |
| | ) | |
| WENDY'S RESTAURANT | ) | |
| | ) | |
|     Defendant. | ) | |

## COMPLAINT

COMES NOW, Plaintiff, Jacqueri Laird, through his attorney, Rachel J. Guin, for his Complaint against Defendant, Wendy's Restaurant, and states as follows:

### I. PARTIES

1.      Jacqueri Laird ("Jacqueri") is a resident of Allen County, in Fort Wayne, Indiana.

2.      Defendant, Wendy's Restaurant ("Defendant"), is a for profit corporation with several locations in Fort Wayne, Allen County, Indiana.

### II. JURISDICTION

3.      This cause represents federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

4.      This Court has supplemental jurisdiction over all ancillary state law and/or common law claims arising out of common nucleus of operative facts as the substantive federal claims pursuant to 28 U.S.C. § 1367.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 as the Defendant is domiciled in Allen County, which is located in the Northern District of Indiana, Fort Wayne Division.

### III. FACTS

5.      Jacqueri, an African-American male, began working for Defendant at its 8909 U.S. 24, Fort Wayne, Indiana location ("Liberty Mills") on or about October 19, 2022 as a cook and cashier.

6.       At the time of his employment with Defendant, Jacqueri was 17 years-old, standing approximately 5'5 and weighing 90 pounds.  He was a senior at Homestead High School having never been in trouble at school or with the law.

7.      One of Defendant's managers, Tyler (white/Caucasian), frequently discussed his criminal record, his probation status and regaining his gun permit in a short period of time.  He had these conversations at work with minor employees, including Jacqueri.

8.      On or about November 18, 2023, Jacqueri was called into a private office by Tyler, and asked if he had a gun in his possession. Jacqueri was taken aback by this question.  He did not have a gun and had never had a gun.  He relayed this to Tyler.

8.      Tyler told him that he would have to check Jacqueri's upper and lower body.  Tyler stood in front of the door which was the only exit from the office.

9.      Jacqueri took off his jacket and laid it on Tyler's desk.  He did not want to take off his pants.  With his small frame, it was clear to any reasonable person he did not have a gun on his person.

10.      Nonetheless, Tyler told Jacqueri that he needed to "check down there" and insisted Jacqueri drop his pants. Jacqueri was afraid and felt as though he had no choice but to listen to his superior.  He did as he was told and unbuttoned his pants and lowered them to the floor.  There was no gun.  Tyler began laughing at Jacqueri.  He then told him to pull-up his pants and go back to work, which Jacqueri did.

10.    Jacqueri's older brother Jacques (19 years-old/black/African-American) was also working at the time.  Jacqueri immediately told him that he had been trapped in the office with Tyler and forced to remove his clothes.

11.    Jacques then confronted Tyler asking why he strip searched Jacqueri.  Tyler brought Jacques back to the same office and told him that a white/Caucasian teen co-worker had accused Jacqueri of having a gun.

12.    Jacqueri, his older brother Jacques, and stepbrother Khamarion [1] (18 years-old/black/African-American) were the only black/African-American employees working for the Defendant at the time.

13.    Jacqueri and Jacques' mother, Yolanda, came to pick them up after their work shift was over.  A second manager, Matt (white/Caucasian), who arrived at Wendy's after the incident came out to the car and explained to Yolanda that an accusation had been made against Jacqueri regarding a gun but that it was not true.

14.    After leaving Wendy's, Jacqueri told his mother what transpired with Tyler. Understandably, Yolanda was upset.  On November 21, 2022, Yolanda went to Wendy's and demanded to speak with a manager.   Yolanda spoke with the store manager, Jenny (white/Caucasian), who stated that she was aware of what happened to Jacqueri but didn't know what to do.  Jenny started to cry.  (Jenny was believed to be in a romantic relationship with Tyler.)

15.    Yolanda asked to speak with someone in the corporate office.  She was then directed to Regional Manager, Rachel (white/Caucasian).

16.    A meeting was scheduled on November 25, 2022, with Rachel, Yolanda, Yolanda's partner Nicole, and Jacqueri.  Yolanda assumed that they would discuss next steps and potential discipline for Tyler, including an apology to Jacqueri.  Instead, Rachel began interrogating Jacqueri,

---

[1] Khamarion had been ill with flu-like symptoms and was out of work during the aforementioned incidents.

questioning whether the incident even happened because she didn't show that Tyler was on the schedule. At this point two (2) separate managers, Jenny, and Matt, had already confirmed to Yolanda that the incident took place. Further, Jacqueri responded that the whole incident should be on video as they have cameras in the management office. Rachel stated that she could not obtain the videos. Those had to come from corporate.

17.     At this point, Yolanda, knowing that her minor son had been the victim of a crime called 911. Police arrived at Wendy's and a police report was made. After the police left, Rachel notified Yolanda that all three of her sons would be switched to the Apple Glen location to avoid future problems.

18. Rachel also made several inappropriate comments to Yolanda and Nicole stating that "people try to get money through lawsuits so they don't have to work" and if her (Rachel's) daughter had been strip searched like Jacqueri she would "beat someone's a**." She concluded by saying that she was leaving Wendy's and didn't care what happened because she got a better job with the "State."

19.     The entire interaction was odd at best. Jacqueri, Jacques, and Khamarion were then removed from the Liberty Mills location and placed on the schedule for the Apple Glen location.

20.     On or about November 28, 2022, Jacqueri and Jacques arrived for their first day of work at the Apple Glen location. Almost immediately, Jacqueri was questioned by his new co-workers asking if he was the kid who was going to sue Wendy's. At this point, he was not suing anyone. The entire situation was traumatizing and was just trying to do his job.

21.     On this same day, Jacques became ill, vomiting at work, and needed to go home. Jacqueri was told that he could not leave. However, Jacqueri's only ride was with Yolanda. Yolanda came to pick up Jacques and Jacqueri had to go with them. This had not been a problem at the Liberty Mills location.

22.     The next time the two worked together Jacques got into a disagreement with an assistant manager (white/Caucasian).  Both Jacqueri and Jacques were kicked out of the building and not allowed to use the phone to call their mom for a ride.  They stood outside in the cold for over an hour waiting on her to pick them up.

23.     Finally, on December 1, 2022, they arrived at work to learn they were both being written-up for leaving without permission and being disrespectful.  Not once at the Liberty Mills location were any of the young men reprimanded or written-up.  They did not return to work at Wendy's after this final incident.

24.     By information and belief both the white/Caucasian co-worker who falsely accused Jacqeuri of having a gun and the white/Caucasian manager who held him in an office against his will and strip-searched him were not reprimanded or moved to a different location.

25.     By information and belief no other white/Caucasian employees have been wrongfully accused of possessing a gun; have been strip-searched; have been transferred to another Wendy's location after complaining of the aforementioned allegations; and/or have been wrongfully reprimanded and ultimately constructively discharged for the same.

## IV. LEGAL CLAIMS

### Count I – Hostile Work Environment

Plaintiff incorporates paragraphs 1 through 25 by reference herein.

26.     Plaintiff was wrongfully accused of having gun by a white/Caucasian co-worker. Plaintiff is and was a non-threatening, quiet, young man that provided no reason other than his race that he would carry a gun or be a threat to anyone.

27.     As a result of his race and the baseless allegations against him, Plaintiff was subject to false imprisonment and a strip search.  Plaintiff, instead of his accuser and manager, was then

moved to a different location where he was questioned about an impending lawsuit that did not exist at the time. Plaintiff was further treated less favorably than his similarly situated white/Caucasian co-workers when he was written-up and reprimanded for situations he had no control over.

28.     Defendant willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Plaintiff's federally protected rights pursuant to 42 U.S.C. § 1981.

29.     As a result of the hostile work environment, Plaintiff suffered inconvenience, embarrassment, anxiety, and other damages.  Defendant's unlawful, discriminatory, and harassing conduct was intentional, knowing, willful, wanton and in reckless disregard of Plaintiff's federally protected rights entitling Plaintiff to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

## Count II – Disparate Treatment

Plaintiff incorporates paragraphs 1 through 29 by reference herein.

30.     Defendant treated black/African-American employees, specifically, Plaintiff, less favorably than similarly-situated white/Caucasian employees in violation of Plaintiff's federally protected rights pursuant to 42 U.S.C. § 1981.

31.     As a result of his race and the baseless allegations against him, Plaintiff was subject to false imprisonment and a strip search.  Plaintiff, instead of his accuser and manager, was then moved to a different location wherein he was questioned about an impending lawsuit that did not exist at the time. Plaintiff was further treated less favorably than his similarly situated white/Caucasian co-workers when he was written-up and reprimanded for situations he had no control over.

32.     As a result of the disparate treatment, Plaintiff suffered inconvenience, embarrassment, anxiety, and other damages.  Defendant's unlawful, discriminatory, and harassing conduct was intentional, knowing, willful, wanton and in reckless disregard of Plaintiff's federally protected rights entitling Plaintiff to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

### Count III – Constructive Discharge

Plaintiff incorporates paragraphs 1 through 32 by reference herein.

33.     Plaintiff was constructively discharged by the Defendant.

34.     As a result of his race and the baseless allegations against him, Plaintiff was subject to false imprisonment and a strip search.  Plaintiff, instead of his accuser and manager, was then moved to a different location wherein he was questioned about an impending lawsuit that did not exist at the time. Plaintiff was further treated less favorably than his similarly situated white/Caucasian co-workers when he was written-up and reprimanded for situations he had no control over.

35.     Due to Plaintiff's race, Defendant made Plaintiff's working conditions so intolerable that Plaintiff, at 17 years-old, had no choice but to resign.

36.     As a result of the constructive discharge, Plaintiff suffered inconvenience, embarrassment, anxiety, wage loss and other damages.  Defendant's unlawful, discriminatory, and harassing conduct was intentional, knowing, willful, wanton and in reckless disregard of Plaintiff's federally protected rights entitling Plaintiff to compensatory damages, punitive damages, front pay, back pay, and reasonable attorney's fees and costs.

### Count IV – Negligent Hiring, Training and Supervision

Plaintiff incorporates paragraphs 1 through 36 by reference herein.

37.     Defendant owed Plaintiff a duty of care from undue risks.

38.    Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and then put him charge of teenagers as young as 16.

39.    Tyler was acting within the scope of his employment when he pulled 17-year-old Jacqueri into his office, shut and blocked the door with his body, and required Jacqueri to remove his clothes.

40.    It was reasonably foreseeable that Tyler, who frequently talks about his criminal record, put in a position of power over minor children would engage in similar unlawful behavior.

41.    As a result of the Defendant's negligent hiring, training, and supervision of Tyler, Plaintiff suffered inconvenience, embarrassment, anxiety, wage loss and other damages.

### Count V – Invasion of Privacy by Intrusion (*Respondeat Superior*)

Plaintiff incorporates paragraphs 1 through 41 by reference herein.

42.    Defendant owed Plaintiff a duty of care from undue risks.

43.    Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and put him charge of teenagers as young as 16.

44.    Tyler was acting within the scope of his employment when he pulled 17 year-old Jacqueri into his office, shut and blocked the door with his body, and required Jacqueri to remove his clothes.

45.    Forcing a 17-year-old child to remove his clothes while blocking his ability to leave the room constitutes an intrusion upon the physical solitude of the Plaintiff's body.

46.    The aforementioned intrusion would be offensive and objectionable to a reasonable person.

47.    It was reasonably foreseeable that Tyler, who frequently talks about his criminal record, put in a position of power over minor children would engage in similar unlawful behavior.

48.    As a result of the intrusion upon the physical solitude of Plaintiff's body, Plaintiff suffered inconvenience, embarrassment, anxiety, wage loss and other damages.

### Count VI – Intentional Infliction of Emotional Distress (*Respondeat Superior*)

Plaintiff incorporates paragraphs 1 through 48 by reference herein.

49.    Defendant owed Plaintiff a duty of care from undue risks.

50.    Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and put him charge of teenagers as young as 16.

51.    Tyler was acting within the scope of his employment when he pulled 17-year-old Jacqueri into his office, shut and blocked the door with his body and required Jacqueri to remove his clothes. Tyler then laughed at Jacqeuri while he stood there nearly naked, further humiliating him.

52.    Plaintiff was a minor child, small in stature, and did not believe he could leave or could even ask to leave.

53.    Tyler was in a position of power and authority over Plaintiff furthering Plaintiff's belief he could not leave.

54.    Plaintiff was intimidated and scared.

55.    Tyler's behavior was intentional, knowing, extreme and outrageous.

56.    As a result of Tyler's behavior while at work with the Plaintiff, Plaintiff suffered severe emotional distress, inconvenience, embarrassment, anxiety, wage loss and other damages.

### Count VII – Negligent Infliction of Emotional Distress (*Respondeat Superior*)

Plaintiff incorporates paragraphs 1 through 56 by reference herein.

57.    Defendant owed Plaintiff a duty of care from undue risks.

58.    Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and put him charge of teenagers as young as 16.

59.    Tyler was acting within the scope of his employment when he pulled 17-year-old Jacqueri into his office, shut and blocked the door with his body and required Jacqueri to remove his clothes.  Tyler then laughed at Jacqeuri while he stood there nearly naked, further humiliating him.

60.    Plaintiff was a minor child, small in stature, and did not believe he could leave or could even ask to leave.

61.    Tyler was in a position of power and authority over Plaintiff furthering Plaintiff's belief he could not leave.

62.    Plaintiff was intimidated and scared.

63.    Tyler's behavior was intentional, knowing, extreme and outrageous.

64.    As a result of Tyler's behavior while at work with the Plaintiff, Plaintiff suffered severe emotional distress, inconvenience, embarrassment, anxiety, wage loss and other damages.

### Count VIII – Negligence (*Respondeat Superior)*

Plaintiff incorporates paragraphs 1 through 64 by reference herein.

65.    Defendant owed Plaintiff a duty of care from undue risks.

66.    Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and put him charge of teenagers as young as 16.

67.    Tyler was acting within the scope of his employment when he pulled 17-year-old Jacqueri into his office, shut and blocked the door with his body and required Jacqueri to remove

his clothes. Tyler then laughed at Jacqeuri while he stood there nearly naked, further humiliating him.

68.     Plaintiff was a minor child, small in stature, and did not believe he could leave or could even ask to leave.

69.     Tyler was in a position of power and authority over Plaintiff furthering Plaintiff's belief he could not leave.

70.     Plaintiff was intimidated and scared.

71.     Tyler's behavior was intentional, knowing, extreme and outrageous.

72.     As a result of Tyler's behavior while at work with the Plaintiff, Plaintiff suffered severe emotional distress, inconvenience, embarrassment, anxiety, wage loss and other damages.

### Count IX – False Imprisonment (*Respondeat Superior*)

Plaintiff incorporates paragraphs 1 through 72 by reference herein.

73.     Defendant owed Plaintiff a duty of care from undue risks.

74.     Defendant breached that duty when it knowingly and intentionally employed manager Tyler, who by reasonable belief has a recent criminal history, bragged about the same in the workplace, and put him charge of teenagers as young as 16.

75.     Tyler was acting within the scope of his employment when he pulled 17-year-old Jacqueri into his office, shut and blocked the door with his body and required Jacqueri to remove his clothes. Tyler then laughed at Jacqeuri while he stood there nearly naked, further humiliating him.

76.     Plaintiff was a minor child, small in stature, and did not believe he could leave or could even ask to leave.

77.     Tyler was in a position of power and authority over Plaintiff furthering Plaintiff's belief he could not leave.

78. Plaintiff was intimidated and scared.

79. Tyler's behavior was intentional, knowing, extreme and outrageous.

80. As a result of Tyler's behavior while at work with the Plaintiff, Plaintiff suffered

severe emotional distress, inconvenience, embarrassment, anxiety, wage loss and other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant, and grant

the following relief:

1. Back Pay from the date of Plaintiff's constructive discharge;

2. Front Pay;

3. Lost employee benefits or other economic damages directly related to the Defendant's

    unlawful conduct;

4. Compensatory damages;

5. Punitive damages (where applicable);

6. Pre-judgment interest;

7. Attorney's fees and other costs related to this action; and

8. All other relief available to Plaintiff at law or in equity.

Respectfully submitted,

**ROTHBERG LOGAN & WARSCO LLP**

By: */s/ Rachel J. Guin*
    Rachel J. Guin, Supreme Court No. 31722-02
    505 East Washington Blvd.
    P.O. Box 11647
    Fort Wayne, Indiana 46859-1647
    Telephone: (260) 422-9454
    Facsimile: (260) 422-1622
    ATTORNEYS FOR PLAINTIFF